**Mark NEELEY, Plaintiff,**

**v.**

**John SAMIS, Richard Bratz, and Delaware State Police, Defendants.**

**No. CIV.A.00–597–SLR.**

United States District Court, D. Delaware.

Jan. 28, 2002.

Edward C. Gill, Georgetown, Delaware, for Plaintiff.

Rosemary K. Killian, Department of Justice, State of Delaware, Wilmington, Delaware, for Defendant.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

## I. INTRODUCTION

Plaintiff Mark Neeley filed this action pursuant to 42 U.S.C. § 1983 against Delaware State Police officers John Samis and Richard Bratz and the Delaware State Police, a governmental agency of the State of Delaware. Currently before the court is the defendants' motion for summary judgment. (D.I.39) For the reasons that follow, the court shall grant defendants' motion.

## II. BACKGROUND

### A. Procedural History

Plaintiff filed suit on June 21, 2000 under 42 U.S.C. § 1983 alleging that Officers Samis and Bratz used excessive force in effecting plaintiff's arrest. (D.I.1) The amended complaint filed August 4, 2000 also alleges that the officers' employer, the Delaware State Police, failed to properly train, supervise, and set forth policies for use of the police dog that assisted Officer Samis in making the arrest. (D.I.1, 7) Plaintiff seeks compensatory and punitive damages for alleged injuries resulting from bites inflicted by the police dog.

### B. Facts

On August 3, 1998, an ongoing feud between plaintiff and his brother-in-law escalated from taunts to a car chase. (D.I. 41 at 23, 31–32, 36–7, 39) After giving up the chase at about 8 p.m., plaintiff went to a bar and drank between two and six beers and two shots of tequila over the course of two and a half hours. (D.I. 41 at 4, 15, 38–9) On the date of the incident, plaintiff was serving a sentence of house arrest for violation of probation stemming from a 1997 marijuana possession conviction. His absence from home after completing an afternoon job interview violated the terms of his probation. (*Id.* at 22–23)

After leaving the bar, plaintiff drove to the home of his in-laws, where his brother-in-law also lived, and parked in the street with the hope of confronting the brother-in-law. Plaintiff then claims that his brother- and father-in-law hit his truck from behind and threatened him with a gun. Plaintiff sped away in his vehicle, but decided to return to the in-laws' house. A verbal altercation ensued in which the in-laws yelled from the fenced yard and plaintiff yelled from his vehicle on the street. This lasted about an hour and a half. (*Id.* at 47–53) Sometime after midnight, two cars came up the road and stopped behind plaintiff's truck. Plaintiff put his truck in reverse and scraped one of the vehicles, which he then determined to be a Clayton, Delaware police car. The other car, a State Police car driven by defendant Officer Bratz, quickly moved out of the way. Plaintiff continued to back up and then "run off." (*Id.* at 54–55) The police pursued him, but plaintiff did not stop. Plaintiff admitted that, by continuing to flee after realizing the two cars were police cars, he hoped to get far enough ahead of the police to stop his truck and run away so they could not prove he was driving under the influence. (*Id.* at 62)

Shortly after the pursuit began, plaintiff lost control and ran off the road into a field. The police cars, each on adjacent roads, tried to block his exit from the field, but plaintiff drove his car back onto the road and head-on into the Clayton Police car. Plaintiff then proceeded up the road toward the State Police car, and Officer Bratz accelerated to get out of his way. (*Id.* at 55–60) Plaintiff claims he did not intend to hit the Clayton Police car and only went toward Officer Bratz' State Police car because it was in the direction of flight. (*Id.* at 59, 60) Officer Bratz, on the other hand, after seeing the head-on collision with the Clayton Police car, radioed this information to the 911 Center, then thought plaintiff was "going to ram [the Clayton police officer] again." (*Id.* at 107, 109) Officer Bratz testified at his deposition that when he saw plaintiff start to come toward him, he thought plaintiff "was going to pursue me" and testified that plaintiff barely missed his car as he drove by. (*Id.* at 109)

Both police cars continued to chase plaintiff for about 12 miles along curving country roads and through small towns at speeds between 50 and 65 miles per hour.

(*Id.* at 131–2) Plaintiff hit a stop sign, knocked down a mailbox, and narrowly missed another vehicle while weaving on and off the road. (*Id.* at 61, 109–111, 131–2) At some point plaintiff lost a rear tire from his truck and continued fleeing on a bare rim. (*Id.* at 110) During the pursuit, Officer Bratz announced his position over the police radio and, at one point, told other police officers "to make sure as they approached my location to turn out their lights" because he thought plaintiff was "just ramming all police cars when he sees the emergency equipment." (*Id.* at 112)

Eventually, plaintiff missed another turn and careened into a field. (*Id.* at 64, 112) Plaintiff then jumped out of his truck and ran into a dark thicket of briars and woods. (*Id.* at 112) Officer Bratz saw plaintiff run into the woods, and he and two other police officers stopped to set up a "perimeter" around the woods and wait for more help to arrive. (*Id.* at 113)

Officer Samis, a member of the State Police Canine Division, first heard about the ongoing pursuit over the police radio as he was transporting a prisoner. He remembers hearing Officer Bratz "coming on the radio saying that [plaintiff] was ramming police cars." (*Id.* at 136) As the pursuit sounded "more and more dangerous," Officer Samis decided to assist the other officers. (*Id.* at 136) Upon arriving on the scene where plaintiff had run into the woods, Officer Samis found Officer Bratz, got police dog Riley out of the car, called out twice to warn plaintiff that he was releasing the dog, and then released the dog to go into the woods with the command "find him" or "find him boy." (*Id.* at 138, 139) Officer Samis testified at his deposition that, in that situation, Riley was trained to go into the woods, search for the suspect, and bite him. (*Id.* at 140) Although the dog is supposed to bite the suspect until commanded to stop, Officer

Samis stated that, based on past experience with Riley, the dog will let go and stand a few feet back if the suspect lies perfectly still after being bitten. (*Id.* at 140)

A minute or so after sending Riley into the woods, Officer Samis and Officer Bratz started into the woods after him. As Officer Samis moved through the woods, he turned his flashlight on and off so as not to give his position away, because "it seemed like [plaintiff] was going to do what ever it took to get away." (*Id.* at 139) Officer Samis then claims to have heard a wordless yell, so he headed in that direction, assuming Riley had found plaintiff and was biting him. (*Id.* at 141) The officer states that when he first came upon plaintiff, he was lying on his stomach with his hands underneath him and the dog was pacing about 10 feet away. (*Id.* at 141–2, 115–6) Officer Bratz testified that he got there immediately after Officer Samis, and plaintiff was crouched down on his stomach and his hands were not visible. (*Id.* at 116)

The officers shouted at plaintiff to show his hands, but both officers claim plaintiff failed to do so and instead struggled with Officer Samis, flailing from side to side to keep the officer from getting his hands out from under his body. (*Id.* at 116–123, 144–6, 155–156) As Officer Samis attempted to gain control of plaintiff's arms, the dog came in and bit plaintiff's neck without being commanded to do so. (*Id.* at 146, 150–1, 165–6) Samis testified that the dog is trained to come in without a command if someone is attacking or struggling with the officer. (*Id.* at 150) After Samis backed off slightly, he saw plaintiff squeezing the dog's muzzle with two hands, and he yelled at plaintiff to let go of the dog. (*Id.* at 146–7) As plaintiff continued to struggle, the dog let go for a second, then bit the top of plaintiff's head. (*Id.* at 147–9) Officer Samis testified that when he saw

blood on plaintiff, he began pulling the dog away, even though plaintiff was still struggling, and he repeatedly told plaintiff to let go of the dog. (*Id.* at 148, 149–151) Samis also ordered the dog to release with the German release command "Aus." (*Id.* at 149–150) "I'm going between Aus to the dog and telling [plaintiff] to stop fighting the dog because I was fairly confident that the dog wasn't going to release while he was still actively fighting because in training, they're trained to bite and hold him until he stops resisting." (*Id.* at 150) Plaintiff finally let go of the dog, and the dog released plaintiff. (*Id.* at 150–1) Officer Samis estimated the whole sequence lasted only "a matter of seconds." (*Id.* at 151) The officer also testified that the only bites he witnessed were to the plaintiff's neck and head, not to the arm or back. (*Id.* at 152)

Officer Bratz testified that during Samis' struggle to gain control of plaintiff, he assisted by yelling for plaintiff to show his hands and by pushing plaintiff back down and striking him on the back with a plastic flashlight when plaintiff tried to get up. (*Id.* at 126–7) After the struggle ended and plaintiff showed his hands, Bratz cuffed plaintiff's hands behind his back. (*Id.* at 128–9) Because plaintiff was bleeding, Officer Samis called for an ambulance. Plaintiff was escorted from the woods by another officer. (*Id.* at 129)

Plaintiff's version of events in the woods differs somewhat from the officers' accounts. A few hours after the incident, plaintiff told the emergency room physician at Kent General Hospital that he got the dog bites when he was "running from the police and stopped when he was cornered by the police dog. He bent over to pet the dog and ... the dog attacked him." (*Id.* at 173)

In a statement to police on August 4, 1998, plaintiff claimed that he was smoking a cigarette, lying on his back, and petting the dog when the first officer arrived. (*Id.* at 9–10) Plaintiff stated at first that the officer rolled him over "like Rambo" and the dog started biting, then later in the interview plaintiff claimed that the officer commanded him to roll over and spread his arms, and plaintiff voluntarily complied with the order. (*Id.* at 9–10) Plaintiff also claimed the officer ordered the dog to attack by giving "some command" after plaintiff had rolled over and the officer had one of plaintiff's hands behind his back. (*Id.* at 10) Plaintiff admitted to pulling both of his arms free and grabbing the dog's jaws and trying to push the dog away. (*Id.* at 9, 10)

In his deposition on January 12, 2001, plaintiff asserted he had conversed with the officers as they tried to find him in the woods and that he led them to his position. He stated he was sitting on his "bottom" when the two officers arrived. (*Id.* at 67–9) In this version of events, the officers told him to roll over on his stomach and put his hands "out" or "in the air," and one officer approached him to handcuff him while the other stood a little distance away. (*Id.* at 67–8) Plaintiff claimed that his left arm was cuffed behind his back, and as the officer brought his right arm back around, plaintiff felt "a slap in the back of my neck but it sounded like somebody said something, but not in English" and he felt pain. (*Id.* at 69) He also stated that the officer was on his left back and the dog first bit him on the head from the left side, then bit the neck. Plaintiff then grabbed the dog's snout with his right hand and held it closed. After the officers repeatedly told him to let go of the dog and that they had control of the dog, plaintiff says he released the dog, but it bit him in the neck again before officers finally succeeded in pulling it off. (*Id.* at 69–77)

Plaintiff's treating physician, Dr. Asher Carey, stated in a deposition that plaintiff was "mildly inebriated" when he saw him at the hospital on August 4, 1998. (*Id.* at 92) His blood alcohol content at 2:33 a.m. that date was 0.12. (*Id.* at 174–5) Dr. Carey testified that plaintiff had bites on the crown of his head, both sides of his neck, his left arm, and his buttocks. The doctor closed the scalp wound with staples. (*Id.* at 83–4, 89, 93) When Dr. Carey next saw plaintiff on August 7, 1998, he observed that the wounds were "nicely" healing without infection. (*Id.* at 85–8, 97(a)). At his deposition, Dr. Carey characterized the injuries as superficial and minor for dog bites, because they only went skin deep and did not cause muscle, bone, or other more serious injury. (*Id.* at 90–1, 94, 95–7, 103–4) Plaintiff has permanent faint scars on his neck and head; the scars on the neck could be improved by cosmetic surgery, but the doctor does not recommend cosmetic surgery on the head scars. (*Id.* at 100–2, 106)

The officer in charge of the Delaware State Police Canine Division, Brian Anderson, submitted an expert report in conjunction with defendants' summary judgment motion. (*Id.* at 167–170) Based on a review of division operating procedures, K–9 Riley's training records, depositions, and police and medical reports, Anderson concluded that Officer Samis and K–9 Riley performed in accordance with the standards of the Delaware State Police Canine Division. For example, Officer Samis twice shouted a warning to the suspect and gave him a chance to surrender before sending the dog into the woods. Anderson also concluded that the wounds on plaintiff's arm are consistent Samis' statement that plaintiff was found initially lying on the ground with hands hidden under his body, because the dog is trained to seek out and bite a suspect in the most accessible part of his body. Anderson as-

serted that the K–9 was trained not to permit anyone to pet him in this situation and would have responded to such conduct with a bite. Furthermore, he opined that plaintiff's struggle with Samis triggered the dog's protective training to defend his handler, as "any motion by the suspect toward the canine would be interpreted by the dog as hostile and provide an independent basis for the bite in this situation." (*Id.* at 169) Plaintiff does not present any expert report or affidavit contradicting or challenging Anderson's conclusions.

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal*

*Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## IV. DISCUSSION

### A. Defendant Delaware State Police

 All parties agree that the suit against defendant Delaware State Police must be dismissed for lack of subject matter jurisdiction. The Eleventh Amendment limits federal judicial power to entertain lawsuits against a State and, in the absence of congressional abrogation or consent, a suit against a state agency is proscribed. *See Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 98–100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). In addition, a state agency is not a "person" subject to claims under 42 U.S.C. § 1983. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Because there has been no congressional abrogation or an unequivocally expressed state waiver of sovereign immunity, the court agrees that the constitutional claims against the Delaware State Police must be dismissed for lack of subject matter jurisdiction.

### B. Defendant Officers Samis and Baltz

Defendants Samis and Baltz assert that they did not use excessive force in the apprehension of plaintiff or, in the alternative, that the doctrine of qualified immunity protects them from liability in this case, because a reasonable officer in defendants' position would not have known that their conduct violated a clearly established constitutional right.

### 1. Doctrine of Qualified Immunity

 The doctrine of qualified immunity protects government officials from liability for civil damages "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). *See also Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The "contours of the right [the official is alleged to have violated] must be sufficiently clear so that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034. "[I]n the light of pre-existing law, the right must be apparent." *Id.* Whether an official is protected by qualified immunity generally turns on the objective legal reasonableness of the action. *Id.* at 639, 107 S.Ct. 3034. The court's inquiry into qualified immunity is primarily legal—whether the legal norms allegedly violated were clearly established—but some fact-specific inquiry into the defendant's actions is required. *Gruenke v. Seip,* 225 F.3d 290, 299 (3d Cir.2000). When looking at the facts, the key question is "whether a reasonable public official would know his or her **specific conduct** violated clearly established rights." *Id.* (citing *Grant v. City of Pittsburgh,* 98 F.3d 116, 121 (3d Cir.1996)). After a defendant properly raises qualified immunity in his or her defense at the summary judgment stage, the burden is on the plaintiff to produce evidence sufficient to create a genuine issue of material fact whether defendant engaged in conduct alleged to have violated a clearly established right. *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir.1990).

The Supreme Court established the objective test for qualified immunity in *Harlow* to allow insubstantial claims to be resolved at the summary judgment stage. *Anderson,* 483 U.S. at 640 n. 2, 107 S.Ct. 3034. In a recent decision, the Court re-emphasized that qualified immunity is designed to protect the official from the litigation itself. *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2155–56, 150 L.Ed.2d 272 (2001). The Court explained that qualified immunity is an immunity from suit, not just a defense to liability, so whether qualified immunity exists must be resolved at the earliest possible stage. *Id.,* 121 S.Ct. at 2156. It then carefully distinguished between the "reasonableness" inquiry for qualified immunity from the "reasonableness" inquiry that is part of determining whether excessive force was used, emphasizing that these were separate inquiries. *Id.,* 121 S.Ct. at 2156. The Court found that to deny summary judgment any time a material issue of fact remained on an excessive force claim could undermine the goal of qualified immunity to resolve insubstantial claims on summary judgment. *Id.*

### 2. Legal Standard for Excessive Force

 Where an excessive force claim is made under the Fourth Amendment, the trier of fact determines whether the defendants' use of force was objectively reasonable under the "facts and circumstances of [the] particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Police officers are permitted to use a reasonable amount of force to effect an arrest; the degree of force is dictated by the suspect's behavior. *Id.*

### 3. Application of Law to Facts

Plaintiff's allegations of excessive force focus solely on the bites he received from the police dog and whether the use of the dog in effecting his arrest violated his constitutional rights. The officers' use of the police dog in apprehending plaintiff can be analyzed in two parts: (1) the initial decision to use the police dog; and (2) the subsequent conduct in attempting to effect plaintiff's arrest.

Undisputed evidence on the record supports the officers' belief that plaintiff had already committed serious crimes, that plaintiff posed an immediate threat to the safety of the officers and the public, and that plaintiff was actively evading arrest by flight. Officer Bratz was part of the pursuit from beginning to end, and he witnessed plaintiff driving recklessly and hitting the Clayton Police car, an action he perceived as intentional. Bratz also waited for help before entering the woods to pursue plaintiff, which indicates that he believed the situation to be a threat to his safety. Officer Samis heard Officer Bratz' announcements over the police radio detailing the progress of the car chase and plaintiff's reckless driving. He also heard Bratz describe how plaintiff had scraped the side of a Clayton Police car and later hit it head-on in an attempt to evade capture. Samis then heard Bratz' warning to other officers to turn off their lights because plaintiff was ramming police cars. Samis decided to assist because the pursuit sounded "more and more dangerous" to him. (*Id.* at 136) When he arrived on the scene, he found that plaintiff had run into dark woods full of briars. Plaintiff admits that he had been drinking that night and was trying to get away from the

police so that they could not prove he was driving under the influence.

■ Based on this record, the court concludes that Officer Samis was reasonable under the circumstances to release the dog into the woods to search for and hold plaintiff, and that Officer Bratz had no reason to intervene with this decision. *See Matthews v. Jones*, 35 F.3d 1046, 1052 (6th Cir.1994) (holding on summary judgment that use of police dog to apprehend suspect who was fleeing into dense woods at night to evade arrest was objectively reasonable). In the alternative, the court finds that a reasonable officer in the officers' position would not have known that using a police dog to apprehend plaintiff violated any clearly established constitutional rights, so the officers are entitled to qualified immunity.

The second part of the court's inquiry is whether the officers' conduct during the arrest of plaintiff constituted excessive force or whether a reasonable police officer in the officers' position could believe that the use of force was lawful.

■ Several factors support a finding that Officer Samis did not use excessive force during the arrest. First, uncontradicted evidence shows that the officers and K–9 Riley followed department procedures and training during the incident. Second, despite plaintiff's assertion that an officer commanded the dog to attack him after he was already complying with arrest, the evidence on the record would lead a reasonable jury to conclude that the dog's attack was uncommanded. Finally, record evidence strongly supports the officers' assertion that plaintiff did not comply with their orders, and in fact struggled with Officer Samis and then with K–9 Riley as

the officer tried to handcuff him. Plaintiff offers inconsistent and often unbelievable statements to support his own version of events.

With respect to the first factor, Officer Samis has testified that he followed department procedures and that K–9 Riley performed according to training during the arrest. An affidavit from the officer in charge of the State Police Canine Division supports Samis' testimony. Plaintiff offers no evidence that the dog was improperly trained or acted contrary to training or expectations.

Both Officer Samis and Officer Bratz testified that Samis announced his intended use of the K–9 before he released the dog into the woods, as required by department procedure. Plaintiff claims not to have heard these announcements, but this does not directly contradict the officers' statements, especially since plaintiff was admittedly busy trying to hide himself from the officers and was inebriated at the time.

Unrefuted evidence that plaintiff was bitten by the dog **before** the officers arrived at the scene also supports a finding that the dog acted in compliance with its training. Medical reports show that plaintiff had bites on his arm and buttocks as a result of the arrest. In a version of events told to an emergency room doctor shortly after his arrest, plaintiff admitted to being bitten after bending over and trying to pet the police dog when the dog found him in the woods. In addition, Officer Samis and the police canine expert stated that the bites on the arm and buttocks were consistent with the dog's training to find the suspect and bite the suspect in the most accessible part of his body.[1] According to

---

1. The one thing K–9 Riley did after finding plaintiff that was inconsistent with his training was to release his bite before being com-

manded to by Officer Samis. However, Samis testified that Riley typically would release his bite if the suspect stopped moving. Sam-

the unrebutted expert report, the dog was trained not to permit anyone to pet it while working, and if plaintiff had done so, the dog would have bitten him.

Officer Samis acknowledges that, while he was trying to gain control of plaintiff's arms, K–9 Riley bit plaintiff on the neck and head without being commanded to do so, and that Riley did not release his bite on plaintiff immediately upon the command "Aus." However, both Samis and the police canine expert testified that K–9 Riley was trained to protect his handler without being commanded to do so. Samis also testified that the command "Aus" was given while plaintiff was still struggling and holding onto the dog's snout. This put the release command "Aus" in conflict with the dog's training to protect his handler and to bite when a suspect touched him. Samis recognized that the dog would not release until plaintiff let go of the dog's snout, so both he and Officer Baltz yelled at plaintiff to let go of the dog. Plaintiff admitted that he grabbed the dog's snout and that the officers yelled at him to let go of the dog. Officers Samis and Baltz both testified that the dog released its bite as soon as plaintiff let go of the dog's snout. Plaintiff does not deny that the dog then released its hold, though in one statement plaintiff claimed that the dog bit him again on the neck before it was finally pulled off of him.

With respect to the second factor, plaintiff asserts in his brief that an officer commanded the dog to attack him even though he was complying with the officers' orders. However, plaintiff fails to offer any concrete evidence that either officer commanded the dog to attack. Instead, plaintiff cites an officer's non-English command given after he felt a "slap in the

neck" as evidence that an officer commanded the dog to attack; plaintiff does not assert that any commands were given before the "slap." (D.I. 43 at 6) Plaintiff testified at his deposition that the dog first bit his head and then his neck, but he could not identify what caused the slap he felt on his neck before the head bite. Officer Samis, who was behind plaintiff, was in the best position to see where the dog bit first, and he stated that the dog first bit the neck and then bit the head. Officer Samis also affirmed that he used the German command "Aus" after the dog started to bite plaintiff on the head to command the dog to release its bite. Officer Samis' account is entirely consistent with plaintiff's statements about what he felt and heard. From the evidence offered, a reasonable jury could only conclude that the slap plaintiff felt was caused by an initial dog bite on the neck, a bite which the dog quickly released and moved to the head, and the non-English command plaintiff heard was Officer Samis' command to release the bite.

In his brief, plaintiff also wants the court to infer that Officer Samis commanded the dog to attack simply from the officer's statement that Riley had never attacked without being commanded to do so and that Riley was acting in accordance with his training on the date of the incident. (D.I. 43 at 7) Such an inference is inappropriate, given that both Samis and the police department canine expert explained that Riley was also trained to protect its handler without a command if the dog perceived a threat. That Riley had never attacked uncommanded before does not mean the dog did not do so here.

is' statement that he found plaintiff lying on his stomach and the dog pacing about 10 feet away is consistent with Samis' description of

Riley's typical response in this type of situation.

With respect to the third factor, plaintiff's statements about his actions after the officers came upon him in the woods are hopelessly inconsistent and undermine his claims of voluntary compliance. Plaintiff provided three different versions of events, one of which, that he was sitting smoking a cigarette and petting the police dog when the officers came upon him, is completely inconsistent with his statement to the emergency room doctor that the dog bit him when he tried to pet him. Plaintiff's statements are also internally inconsistent in that at one point in his 1998 statement he claimed that the officer rolled him onto his stomach "like Rambo" and at another claimed that he voluntarily complied with the order to roll over onto his stomach. (*Id.* at 9–10) Where all parties agree is that plaintiff grabbed the dog's snout after it bit him and plaintiff would not let go, even though the officers were shouting at him to do so. Plaintiff's statement that he could pull both hands free to grab the dog's snout (as he claimed in his 1998 statement) contradicts his assertion that a police officer had one hand in control behind his back, and is completely inconsistent with his 2001 deposition statement that his left hand was handcuffed behind his back when the dog first bit.

While there may be a genuine dispute as to whether plaintiff struggled before the dog started biting, the record is clear that plaintiff struggled afterward. Plaintiff's and defendants' statements about the officers' efforts to get plaintiff to stop grabbing the dog and to get the dog to release his bite are completely consistent and reveal no genuine factual dispute.

Based on this record, the court concludes that no genuine disputes of material fact remain. Because the court finds that Officer Samis followed procedures and training, the dog attacked plaintiff uncommanded, and plaintiff struggled after the dog first bit him, it concludes that a reasonable jury could not find that Officer Samis used excessive force.

The court also concludes that no reasonable jury could find that Officer Bratz used excessive force. None of the evidence on the record indicates that Officer Bratz issued any commands to the police dog or controlled the dog in any way. The undisputed evidence shows that Officer Samis was the officer who initially sought to control plaintiff's arms. After the attack began, the evidence shows that the only force used by Officer Bratz was to hit plaintiff on the back several times with a plastic flashlight and to help Officer Samis push plaintiff down when plaintiff allegedly struggled with Officer Samis and grabbed the dog's snout. Bratz only used force after plaintiff began to struggle with the dog and used it to get plaintiff to stop grabbing the dog's snout and to get the dog off of plaintiff. Based on this evidence, the court finds no genuine issues of material fact and concludes that the force Bratz used was objectively reasonable under the circumstances.

The court's analysis does not stop there, however, because the defendants also assert qualified immunity. The court finds no persuasive case law to support the notion that police officers should be responsible under § 1983 for an uncommanded attack by a police dog or that an officer, such as Officer Bratz, who is not the handler should be responsible for controlling a police dog. Because the contours of the law are not clearly established, a reasonable officer in Officer Samis' or Officer Bratz' position could not know that his specific actions violated any law and, as a result, they are entitled to qualified immunity from liability.

## V. CONCLUSION

For the reasons stated above, the court finds that the suit against the Delaware State Police must be dismissed for lack of subject matter jurisdiction. Furthermore, the court finds that no genuine issues of material fact remain and that a reasonable jury could not find that defendants Baltz and Samis used excessive force in effecting plaintiff's arrest. In the alternative, the court finds that a reasonable police officer in defendants' position would not have known that the use of the police dog violated a clearly established constitutional right of plaintiff. Therefore, the defendants are entitled to qualified immunity from liability. Accordingly, the court shall grant defendant's motion for summary judgment. An appropriate order shall issue.