Diane SMITH, individually and
as guardian for A.K, S.K.,
and M.K., Plaintiffs,

v.

State of DELAWARE, Department of Services for Children, Youth, & Their Families, Division of Family Services; Kathleen Finn, individually and in her official capacity; Home Health Specialists; Doris Elliot; and Linda Brasburger, Defendants.

Civ. No. 07–600–JJF–LPS.

United States District Court,
D. Delaware.

June 25, 2010.

James H. McMackin, III, Allyson Marie Britton, Morris James LLP, Wilmington, DE, for Plaintiffs.

Eileen M. Ford, Jeffrey S. Marlin, Marks, O'Neill, O'Brien & Courtney, P.C., Wilmington, DE, for Defendants.

## ORDER

JOSEPH J. FARNAN, JR., District Judge.

WHEREAS, Magistrate Judge Stark issued a Report and Recommendation (D.I. 197) dated May 17, 2010, concerning (1) a Motion To Exclude Plaintiffs' Expert And Plaintiff's Expert Reports filed by Defendants Home Health Specialists, Linda Brasburger, and Doris Elliott ("HHS Defendants") (D.I. 158); (2) a Motion For Summary Judgment filed by the HHS Defendants (D.I. 159); and (3) a Motion For Summary Judgment filed by Defendants State of Delaware, Department of Families, Department of Services For Children, Youth, & Their Families, Division of Family Services, and Kathleen Finn ("State Defendants") (D.I. 167);

WHEREAS, the Report recommends: (1) granting in part and denying in part HHS Defendants' Motion To Exclude; (2) granting in part and denying in part HHS Defendants' Motion For Summary Judgment; and (3) granting State Defendants' Motion For Summary Judgment;

WHEREAS, the HHS Defendants filed an Objection to the Report and Recommendation (D.I. 202);

WHEREAS, Plaintiff filed an Objection to the Report and Recommendation (D.I. 203)[1];

WHEREAS, the Court concludes that the Report and Recommendation should be adopted for the reasons stated by Magistrate Judge Stark in his Report and Recommendations (D.I. 197);

NOW THEREFORE, IT IS HEREBY ORDERED that:

1. The Report and Recommendation (D.I. 197) is *ADOPTED;*

2. HHS Defendants' Motion To Exclude Plaintiffs' Expert And Plaintiff's Expert Reports (D.I. 158) is *GRANTED IN PART and DENIED IN PART.*

3. HHS Defendants' Motion For Summary Judgment (D.I. 159) is *GRANTED IN PART and DENIED IN PART;*

4. State Defendants' Motion For Summary Judgment (D.I. 167) is *DENIED AS MOOT.*

### *REPORT AND RECOMMENDATION REGARDING MOTIONS FOR SUMMARY JUDGMENT AND ORDER ON EVIDENTIARY MOTIONS*

LEONARD P. STARK, United States Magistrate Judge.

The Plaintiffs in this action are Diane Smith and her minor children, A.K., S.K., and M.K. There are two sets of Defendants; the "State Defendants," who are Kathleen Finn and the Delaware Division of Family Services ("DFS"); and the "Home Health Specialists Defendants" ("HHS Defendants"), who are Home Health Specialists ("HHS"), Linda Brasberger, and Dora Elliott. (Collectively, I will refer to the State Defendants and the HHS Defendants as "Defendants.") Plaintiffs allege violations of their civil rights under 42 U.S.C. § 1983 and multiple related state-law violations. All of Plaintiffs' claims relate to the temporary removal of her three children (the minor Plaintiffs) from their home with Smith.

Pending before the Court are the Defendants' two motions for summary judgment (D.I. 159; D.I. 167) as well as the HHS Defendants' motion to exclude Plaintiffs' expert and expert report (D.I. 158). For the reasons set forth below, I recommend that the State Defendants' motion for summary judgment be granted and that the HHS Defendants' motion for summary judgment be granted in part and denied in part. I further order that the HHS Defendants' motion to exclude be granted in part and denied in part.

### *BACKGROUND*

**A. *Procedural History*'**

Plaintiff Diane Smith filed her complaint on September 28, 2007, asserting fourteen claims under federal and state law. (D.I. 1) The HHS Defendants filed their motions for summary judgment and to exclude evidence on December 16, 2009 (D.I. 158; D.I. 159), and the State Defendants followed with their motion for summary judgment on December 18, 2009 (D.I. 167). Briefing on the motions was completed in March 2010. (D.I. 183; D.I. 185; D.I. 190) On April 7, 2010, I held a hearing on the pending motions. *See* Transcript of April

---

**1.** Subsequent to the issuance of the Report and Recommendation, Plaintiffs and State Defendants voluntarily stipulated to the dismissal, with prejudice, of all claims against State Defendants. (D.I. 208.) Pursuant to the stipulation, Plaintiffs waive any right to file objections to the Report and Recommendation with respect to summary judgment, and neither party is to be deemed a prevailing party. (*Id.*) Although the Report recommended granting State Defendants' Motion For Summary Judgment (D.I. 167), it will be denied as moot in light of the stipulation of dismissal.

7, 2010 Hearing (D.I. 195) (hereinafter "Tr.").

## B. Factual Background[1]

### 1. The Parties

Plaintiff Diane Smith is a nurse and the natural mother of the triplet minor Plaintiffs. (D.I. 172 at 4) The minor Plaintiffs, A.K., S.K. and M.K., were born prematurely on September 8, 2000. (*Id.*) S.K. and A.K. were born with medical conditions. (*Id.*)

Defendant DFS is an agency of the State of Delaware. (D.I. 11 ¶ 5) Defendant Kathleen Finn was at all times relevant to this litigation employed by DFS as a Family Services Specialist. (*Id.* ¶ 6)

Defendant HHS is a private home nursing care agency. (D.I. 1 ¶ 7; D.I. 20 ¶ 7) Defendants Elliott and Brasberger were at all times relevant to this litigation nurses and employees of HHS. (D.I. 1 ¶¶ 8–9; D.I. 20 ¶¶ 8–9) Elliott and Brasberger began working in Smith's home in February 2001. (D.I. 20 ¶ 14)

### 2. The Allegations

The minor Plaintiffs first came to the attention of DFS on Friday, October 28, 2005, when DFS received an anonymous complaint through its hotline service reporting that the children were suffering from abuse and neglect. (D.I. 169 at A60–62)[2] The anonymous caller indicated that A.K. and S.K. had serious health problems and that M.K. had behavioral issues. (*Id.* at A61) The caller reported that S.K. used a trachiotomy tube and that A.K. had difficulties swallowing and had such low blood sugar levels that the caller had found it necessary to intervene. (*Id.*) According to the caller, A.K. was also supposed to be in weekly therapy for depression and anxiety, but the children's mother had not taken A.K. to therapy for several months. (*Id.*) The caller further reported that the mother hit M.K. with a leather studded belt, which left a bruise that was fading at the time of the call. (*Id.*) The caller stated, too, that the mother hit A.K. and S.K., and double-gated M.K. in his room at night, preventing him from reaching the bathroom. (*Id.*) Sometimes M.K. was forced to lay in his own urine for hours. (*Id.*)

The anonymous caller also stated that the mother often failed to pay the electricity bill, so the power at the house had been turned off seven times. (*Id.*) According to the caller, there was also often not enough food in the house (though there was always something for the children to eat). (*Id.*) The caller further reported that the mother was often away from the house, leaving the children in the care of relatives, babysitters, and nurses, not all of whom were trained to handle medical emergencies that might arise. (*Id.*) One of the caregivers was the mother's sixteen-year-old son, John Campbell, who was allowed to care for the children alone for a few hours each day. (*Id.*) Although Campbell was trained to handle an emergency with the children and to call 911, the caller was concerned that emergency services might not arrive in time. (*Id.*)

DFS classified the anonymous complaint as a routine referral. (*Id.* at A66) It was assigned by DFS supervisor Brenda Roslyn to social worker Kathleen Finn. (*Id.*) On November 4, 2005, a week after the call had been received, Finn went to the Smith

---

1. The Court has gleaned the following factual background from the parties' summary judgment filings. Where there are disputes of fact, all reasonable inferences are drawn in Plaintiffs' favor.

2. References to the record which include an "A" or "B" number are references to Bates stamped appendices pages. References which further include a "p." number are references to deposition pages within a given appendix.

home along with her coworker, Angel Rollins. (*Id.* at A68–71) They arrived at about 3:00 p.m. (*Id.* at A68) Smith was out of the home on a scheduled weekend trip. (*Id.*) Present in the home in addition to the three children were Defendant Nurse Brasberger; Smith's son, Campbell; and the minors' paternal uncle, Daniel Kern. (*Id.*) Finn and Rollins observed Kern feeding S.K. thickened foods and saw that A.K. had a trachiotomy tube inserted into her throat. (*Id.* at A69) The children's paternal grandfather, Richard Kern, arrived at the home while Finn and Rollins were there. (*Id.*) Richard Kern presented them with a certificate of medical training from A.I. DuPont children's hospital. (*Id.*)

Much else is disputed about events occurring after Finn and Rollins arrived at the Smith home. It is agreed that Finn or Rollins spoke to Smith by telephone at least twice. (D.I. 169 at A275–76 at pp. 72–76; D.I. 168 at 6) Rollins testified in her deposition that she initially spoke to Smith "within minutes" of arriving at the Smith home. (D.I. 169 at A201 at p. 19) Rollins further testified that, during that conversation, Smith indicated she would not be returning home the night of November 4 and that she had left the children in the care of appropriate caregivers. (*Id.*) According to Rollins, only in a subsequent telephone conversation with Finn did Smith say she would be coming home. (*Id.* at A69) Smith testified that she immediately left to return home after the initial conversation with Rollins. (*Id.* at A276 at p. 75) It is undisputed that Smith did arrive home within one to two hours after she had been initially contacted by DFS. (*Id.* at p. 77; *id.* at A201 at pp. 19–21)

In the meantime, Finn and Rollins interviewed Daniel Kern and John Campbell at the home to evaluate their fitness as caregivers. (*Id.* at A68–71) They determined that the uncle, Daniel Kern, had a mental illness, a history of alcohol abuse, and an extensive criminal record. (*Id.*) They further determined that Smith's teenage son, Campbell, had a history of mental illness and a criminal background. (*Id.*) Campbell told the social workers that he was not comfortable if something happened to the children and that he would not know what to do. (*Id.* at A200 at p. 15) Although the interviews were conducted before Smith returned home, it is unclear from the record whether the criminal background checks were completed before Smith's arrival. (*Id.* at A147 at p. 65; *id.* at A153 at p. 89) The social workers also interviewed Smith when she returned home. (*Id.* at A70–71)

Defendant Nurse Brasberger also spoke to Finn and Rollins while they were in the Smith home conducting their investigation on November 4, 2005. Brasberger told the social workers she did not know where Smith was staying that night. (*Id.* at A69) Brasberger also told them that Daniel Kern had a history of alcohol abuse and was not medically trained to care for the children. (*Id.*; D.I. 178 at B17) Brasberger told Finn that Richard Kern, despite his training, was not able to recognize signs of distress in the children. (D.I. 169 at A69) Brasberger added that she once found A.K. semi-conscious with low oxygen and sugar levels while in Richard Kern's care and that Kern thought the child was just sleeping. (*Id.*)

Finn and Rollins did not substantiate many of the claims made by the anonymous caller, including the allegations of abuse. (*Id.* at A149 at pp. 71–73) Nonetheless, the social workers determined that Smith had left the children with inappropriate caregivers. (*Id.* at A68–71) Finn and Rollins testified that they reached this conclusion primarily based on information provided to them in the home by Nurse Brasberger and their own investigation of Daniel Kern's and Campell's background

and caregiving qualifications. (*Id.* at A162 at p. 125; *id.* at A200 at p. 15; *id.* at A203 at p. 28; *id.* at A204 at pp. 30–31; *id.* at A205 at p. 36; *id.* at A209 at pp. 51–52) Finn and Rollins were also concerned that Smith might not stay home that night after the social workers left. (D.I. 169 at A71) Finn and Rollins relayed this information to their supervisor, Roslyn, who decided to petition for an emergency *ex parte* order from the Delaware Family Court to grant DFS temporary custody of the three children. (*Id.* at A69, 78) The Family Court granted the petition. (*Id.;* D.I. 163 at 18–20)

There was also a police presence in the Smith home on the day of the DFS investigation. At 3:55 p.m. on November 4, 2005, the New Castle County Police were called to the house. (D.I. 178 at B7) The record does not establish the time of arrival of the police. It does reveal that Officer Eckerd interviewed Defendant Brasberger. (D.I. 178 at B9) Brasberger told Officer Eckerd that S.K. had a trachiotomy tube. (*Id.*) She also told the officer that A.K. suffered from depression and had to be given thickened foods to prevent her from choking. (*Id.*) Brasberger additionally expressed concerns about Daniel Kern's and Robert Kern's ability to care for the children. (*Id.*) Specifically, Brasberger told Officer Eckerd that Daniel Kern had a history of alcohol abuse and indicated that when she last saw the triplets under Robert Kern's care, A.K. was lying on the couch semi-conscious with low blood sugar. (*Id.*) She added that Robert Kern had merely thought A.K. was tired. (*Id.*) Brasberger told Officer Eckerd that she had seen Smith hit M.K. with a metal studded belt. (*Id.*) Brasberger also expressed concerns for her family's safety and a desire to remain anonymous. (*Id.*) Officer Eckerd's report indicates that the Family Court granted DFS custody of the children by 6:30 p.m. (*Id.* at B10)

The children were removed from the home sometime shortly after 6:30 p.m. November 4, 2005 (and were taken to A.I. DuPont Hospital for examinations). (*Id.* at B11; D.I. 169 at A71) The children were found to be in good health with no visible injuries or signs of neglect. (D.I. 178 at B11; D.I. 169 at A71) M.K. was subsequently placed in foster care; his sisters, A.K. and S.K., remained at A.I. DuPont Hospital. (D.I. 169 at A71) On the following Monday, November 7, all three children were returned to Smith under a Safety Plan. (*Id.* at A77) The Safety Plan specified that Smith could not be with the children unsupervised; either Catherine Kilmartin, Smith's mother (D.I. 168 at 9), or Robert Kern had to be present as well (D.I. 169 at A77).

On November 16, 2005, Family Court Judge Chapman held a Preliminary Protective Hearing. (*Id.* at A80) At the hearing, Smith stipulated that at the time DFS filed for custody of the children, DFS believed Smith was not providing appropriate supervision to the children. (*Id.* at A116) Smith also stipulated to a finding of probable cause and agreed to schedule a meeting to discuss resolution of the case. (*Id.*) In his December 22, 2005 Order, Judge Chapman granted legal custody to DFS until further order of the Court, but allowed the children to continue living with Smith under the conditions of the Safety Plan. (*Id.* at A116–17) On December 13, 2005, DFS moved the Family Court to rescind the previous order of legal custody of the children to DFS and back to Smith. (*Id.* at A119–20) The Family Court granted the motion on January 27, 2006. (*Id.* at A121)

Meanwhile, on November 23, 2005, DFS notified Smith of its intent to place Smith's name on the Child Protection Registry ("Registry") at Child Protection Level III. (*Id.* at A122–23) Smith requested a hear-

ing on DFS' Notice of Intent to Substantiate in the Family Court on December 14, 2005. (*Id.* at A125) On January 6, 2006, DFS petitioned the court to substantiate Smith and add her name to the Registry pending outcome of the substantiation proceedings. (*Id.* at A127–28) The interim petition was denied and, on February 12, 2009, the initial petition was also denied. (D.I. 176 at B37–38) Somehow, however, Smith's name became active on the Registry on January 2, 2006. (D.I. 169 at A332) As a result, DFS reported Smith out to a potential employer as ineligible to work in a health care facility on July 21, 2006. (*Id.* at A362) Smith's name was removed from the Registry on July 27, 2006. (D.I. 174 at 13; D.I. 168 at 13)

### C. *The Claims*

Plaintiffs' claims arise from the damages they allegedly suffered as a result of the children being removed from the home. Plaintiffs allege that their damages are the direct result of the tortious, negligent, and malicious acts of Finn, Brasberger, and Elliott. (*See* D.I. 1) Plaintiffs further attempt to hold DFS and HHS liable through application of the doctrine of *respondeat superior.* (D.I. 1 ¶¶ 40–41) In particular, Plaintiffs allege that Elliott or Brasberger or both of them made the anonymous call to DFS and knowingly relayed to DFS serious and false allegations of abuse and neglect against Smith. (*Id.* ¶ 19) Plaintiffs further allege that, contrary to the anonymous complaint, Smith had made arrangements for persons trained in the care of the children to be present in the home at all times while she was to be away on November 4, 2005, (*Id.* at ¶¶ 16–17) Plaintiffs also allege that Elliott and Brasberger conspired with DFS' Finn during the DFS investigation at

Smith's home, for the purpose of taking the children away from Smith. (*Id.* ¶ 22) Plaintiffs allege, too, that Finn acted unreasonably and in bad faith by relying on Brasberger's comments to her in the Smith home and failing to conduct an adequate investigation at the home, which ultimately resulted in the removal of the children. (D.I. 174 at 24, 26)

Specifically, the Complaint asserts the following claims against the State Defendants: Count I—false imprisonment; Count V—malicious prosecution; Count VI—wrongful use of civil proceedings; Count VII—violations of 42 U.S.C. § 1983; Count VIII civil rights for adding her name to the Registry; Count IX—defamation; Count X—interference with custody; Count XI—civil conspiracy; and Count XII—violation of substantive due process for placing Smith's name on the Registry.[3]

The Complaint further alleges the following claims against the HHS Defendants: Count I—false imprisonment; Count II—negligence; Count III—defamation; Count IV—malicious prosecution; Count VII—violations of 42 U.S.C. § 1983; Count X—interference with custody; Count XI—civil conspiracy; Count XIII—negligent hiring (against HHS); and Count XIV—simple negligence (against HHS).

## LEGAL STANDARDS

### A. *Motion for Summary Judgment*

A grant of summary judgment is appropriate only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The

---

**3.** A claim for negligent hiring against HHS (Count XIII) was previously dismissed. (D.I. 163 at 47)

moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter,* 476 F.3d 180, 184 (3d Cir.2007). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (internal quotation marks omitted). Moreover, "the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505 (internal quotation marks omitted).

### B. *Motion to Exclude Evidence*

■ Motions to exclude evidence are committed to the Court's discretion. *See In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 749 (3d Cir.1994). The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence and the Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Pursuant to Rule 702, in order to be admissible expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." The Supreme Court has assigned "to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597, 113 S.Ct. 2786. Thus, expert testimony shall be admitted at trial only if: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed.R.Evid. 702; *see also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The Third Circuit has described these requirements as "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.,* 233 F.3d 734, 741 (3d Cir.2000).

■ Rule 702 embodies a liberal policy of admissibility. *See Pineda v. Ford Motor Co.,* 520 F.3d 237, 243 (3d Cir.2008). Nonetheless, the burden is placed on the party offering expert testimony to show that it meets all the standards of admissibility. *See Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. 2786; *In re TMI Litig.,* 193 F.3d 613, 663 (3d Cir.1999). Once that burden is met, a Court must consider additional factors before precluding expert testimony:

(1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in

the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation.

*Konstantopoulos v. Westvaco Corp.,* 112 F.3d 710, 719 (3d Cir.1997) (internal quotation marks omitted). "The exclusion of important evidence is an extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *In re Paoli,* 35 F.3d at 791–92 (internal quotation marks and citation omitted).

## DISCUSSION

### A. *State Defendants' Motion for Summary Judgment*

The State Defendants assert that they have immunity from all of the claims asserted against them and, therefore, are entitled to summary judgment. I agree.

■■■ The Eleventh Amendment to the United States Constitution states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or Citizens or Subjects of any Foreign State." The Eleventh Amendment renders states "immune from suits brought in federal courts by [their] own citizens as well as by citizens of another State." *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Hence, the Eleventh Amendment "limits federal judicial power to entertain lawsuits against a State and, in the absence of congressional abrogation or consent, a suit against a state agency is proscribed." *Neeley v. Samis,* 183 F.Supp.2d 672, 678 (D.Del.2002); *see also Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98–100, 104 S.Ct. 900, 79 L.Ed.2d

67 (1984). Congressional abrogation of state immunity from suit requires a clear indication of Congressional intent. *See Neeley,* 183 F.Supp.2d at 678. This clear indication is lacking in 42 U.S.C. § 1983, which provides a cause of action against "persons," not "states." *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Nor has the State of Delaware waived its Eleventh Amendment immunity. *See Brooks–McCollum v. Delaware,* 213 Fed. Appx. 92, 94 (3d Cir.2007); *see also Buchanan v. Gay,* 491 F.Supp.2d 483, 493 (D.Del.2007). Therefore, DFS is immune from Plaintiffs' § 1983 claims.

■■■ DFS is also immune from Plaintiffs' state law claims. The State Defendants have not consented to this suit. Accordingly, as the Delaware Supreme Court has held, sovereign immunity applies "unless there is a statute by which the General Assembly can be said to have waived the defense." *Doe v. Cates,* 499 A.2d 1175, 1176–77 (Del.1985). The Delaware General Assembly has not waived sovereign immunity for purposes of claims like those asserted by Plaintiffs. *See id.* at 1179–80 (holding that sovereign immunity was not waived through enactment of State Insurance Act, 18 *Del. C.* § 6511). Moreover, because there is no evidence that the State of Delaware has purchased insurance for claims like those pressed here, the State Tort Claims Act, 10 *Del. C.* §§ 4001–4005, does not act as a waiver of sovereign immunity. *See Doe,* 499 A.2d at 1180.[4]

■■■ Turning to State Defendant Finn, Plaintiffs allege that Finn acted in both her official and individual capacities. To the extent Finn acted in her official capaci-

---

**4.** I decline Plaintiffs' invitation to overrule the Delaware Supreme Court's holding in *Doe.*

(D.I. 174 at 15; Tr. at 30)

ty as an employee of the State of Delaware, she is immune from Plaintiffs' claims for the same reasons as DFS. *See Rodriguez v. Stevenson,* 243 F.Supp.2d 58, 63 (D.Del.2002) (holding that state immunity extends to DFS and its officials acting in official capacities).

To the extent Finn acted in her individual capacity, she is not immune under the Eleventh Amendment or sovereign immunity. Plaintiffs have not been entirely clear about the extent to which they are alleging that Finn acted in her official capacity and the extent to which they allege she acted in her individual capacity. However, it is unnecessary to attempt to determine which of Finn's actions were performed in her individual or official capacity because the harms Plaintiffs complain of were the result of actions Finn performed during the course of her duties as a child welfare worker. Consequently, Finn may enjoy other types of immunity, even assuming Plaintiffs are asserting (and can prove) she acted in her individual capacity. *See Kentucky v. Graham,* 473 U.S. 159, 166–167, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (explaining absolute immunity and qualified immunity are defenses available to government officials sued in their individual capacities).

■■■■■ Child welfare workers have absolute immunity "for their actions on behalf of the state in preparing for, initiating, and prosecuting dependency proceedings ... [which is] broad enough to include the formulation and presentation of recommendations to the court in the course of such proceedings." *Ernst v. Child & Youth Servs. of Chester County,* 108 F.3d 486, 495 (3d Cir.1997). This immunity is based on the idea that the functions of child welfare workers are analogous to those performed by prosecutors, who were immune from suit at common law. *See id.* at 493–94. A state child welfare worker acting in an investigative or administrative

capacity is entitled only to qualified immunity. *See id.* at n. 7.

■■■■■ For other types of functions, child welfare workers may enjoy qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (internal quotation marks omitted). A right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "[T]he question is whether a reasonable public official would know that his or her *specific conduct* violated clearly established rights." *Grant v. City of Pittsburgh,* 98 F.3d 116, 121 (3d Cir.1996). Qualified immunity, thus, protects government officials from liability for "mere mistakes in judgment, whether the mistake is one of fact or one of law." *Butz v. Economou,* 438 U.S. 478, 479, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). It is up to the Court to decide whether the facts alleged, taken in the light most favorable to the party asserting injury, show a violation of a constitutional right and whether that right is clearly established. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

The parties do not agree which of Finn's actions are prosecutorial in nature—and therefore entitled to absolute immunity—and which are investigative or administrative in nature—and therefore entitled only to qualified immunity. (Tr. at 17, 33–34) It is not necessary to resolve this dispute. Even assuming that all of the actions un-

dertaken by Finn are subject only to qualified immunity, she is immune.

Plaintiffs contend that Finn is not entitled even to qualified immunity because she should have known that certain of her actions during the investigation at Smith's home would result in the removal of the children in violation of the "recognize[d] ... liberty interests that parents have in the custody, care and management of their children." (D.I. 174 at 20–21; *see also Croft v. Westmoreland County Children and Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir.1997)) However, "[the] liberty interest in familial integrity is limited by the compelling governmental interest in the protection of children.... [I]t does not include a right to remain free from child abuse investigations." *Croft*, 103 F.3d at 1125. To assert an interest in protecting children from their parents, a state must have "some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id.* at 1126.

Thus, the issue here is whether there is sufficient evidence in the record from which a reasonable factfinder could conclude that Finn lacked a reasonable suspicion that the children had been abused or were in imminent danger. If there is such evidence, then a reasonable factfinder could agree with Plaintiffs that Finn violated Smith's protected interest in the custody, care, and management of her children. If there is not such evidence, however, then Finn is entitled to qualified immunity from Plaintiff's claims.

Plaintiffs allege that Finn could not have reasonably believed there were facts to support the allegations of child abuse or neglect DFS received during the anonymous phone call and, therefore, could not have formed a reasonable suspicion of such abuse, particularly given that she failed to conduct an adequate investigation when in Smith's home. (D.I. 174 at 22–25) Plaintiffs especially fault Finn for not contacting the children's pediatrician to evaluate their medical needs and the ability of the caregivers present—Campbell and Daniel Kern—to care for them. (*Id.* at 22–23) Plaintiffs further argue that it was unreasonable for Finn to rely on statements made to her and Rollins by Brasberger since the social workers were unable, during their investigation in the home, to substantiate many of the allegations contained in the anonymous complaint. (*Id.* at 24)

Having reviewed the record, I find that there is not sufficient evidence to support Plaintiffs' contention that Finn could not have had a reasonable suspicion of abuse. It is undisputed that Finn observed that the children had significant medical needs. Finn saw one child with a tracheotomy tube in her throat and another being fed thickened liquids. (D.I. 169 at A68; *id.* at A201 at p. 18) Daniel Kern also told the social workers that S.K. needed a nurse in the home and that Campbell needed adult supervision. (*Id.* at A68) The professional in-home nurse on duty, Brasberger, told the social workers that the children had significant medical needs and that Daniel Kern, who was to be the primary adult caretaker overnight, had a history of alcohol abuse. (*Id.*) Finn confirmed that Daniel Kern had three convictions for driving under the influence of alcohol, an extensive criminal background, and that he was bipolar and taking lithium. (*Id.* at A146 at p. 58) Finn also observed that he "looked tired and had some difficulties hearing [her] questions." (*Id.* at A68) Daniel Kern told Finn that he knew how to take care of the children, but admitted that did not have formal medical training. (*Id.* at A153 at p. 88) Finn further determined that Campbell, himself a minor, had a history of depression and a conviction for criminal mischief. (*Id.* at A69–70) When questioned about his ability to care for the children, Campbell told the social workers

he would not know what to do if something happened to them. (*Id.* at A200 at p. 15)

Taking this record evidence in the light most favorable to Plaintiffs, no reasonable factfinder could conclude that Finn lacked a basis for a reasonable suspicion that the children were subject to abuse and neglect. There is no evidence from which one could conclude that it was unreasonable for Finn to rely on Brasberger's statements, particularly as Finn was able to confirm what Brasberger told her about Daniel Kern's background. Brasberger was a professional nurse, the only medically-trained professional in the home. The statements of Daniel Kern about the medical needs of the children were consistent with what Finn heard from Brasberger. Once Finn identified the mental health and criminal history backgrounds of Daniel Kern and Campbell, it was not objectively unreasonable for her to determine that they were inappropriate caregivers.

Plaintiffs further assert that Finn acted in bad faith—and, thus, without a reasonable belief that the children were in danger of abuse or neglect—by relaying false, misleading, and incomplete information to her supervisor, Roslyn, who relied on Finn's information in seeking emergency custody of the children. (D.I. 174 at 26) Plaintiffs point out that Finn did not tell Roslyn that Daniel Kern and Campbell were trained to care for the children, and that other individuals with similar training, including a paid babysitter and Smith's father-in-law, were scheduled to watch the children that night while Smith was away. (*Id.*) Further, Plaintiffs contend that Finn lied to Roslyn by saying she had been unable to contact Smith, when the fact was that Rollins spoke with Smith on her cell phone "within minutes" of arriving at the home. (*Id.*) Plaintiffs also contend that Finn misleadingly advised Roslyn that Finn was concerned Smith might not stay home, when Smith had not stated any intention to leave, and Smith's initial reluctance to return home had been due only to the social workers' failure to express to Smith the seriousness of the situation. (*Id.*; D.I. 169 at A151 at p. 80; *id.* at A204 at pp. 31–32)

However, the record does not support Plaintiffs' contentions. Rather, the undisputed evidence shows that Smith asked the first DFS caller "if I needed to come home" (*id.* at A276 at p. 74), which could have been interpreted by the social workers as reluctance by Smith to rush home and given rise to their concern she might again leave the home. Also, by the time Roslyn petitioned the Family Court to remove the children from the home, Finn had told Roslyn that the social workers had been in contact with Smith and Smith had returned home. (*Id.* at A185–87 at pp. 27–34) Accordingly, there is not evidence from which a reasonable factfinder could conclude that Finn acted in bad faith.

Thus, again, I recommend that the Court grant the State Defendants' Motion for Summary Judgment.

## B. *The HHS Defendants' Motion for Summary Judgment*

The HHS Defendants move for summary judgment on all claims still pending against them. Because all of Plaintiffs' claims are premised on the allegation that Defendant Brasberger or Defendant Elliott made the anonymous complaint to DFS on October 28, 2005, I address this preliminary issue first.

### 1. *Evidence as to Who Made the Anonymous Complaint*

The record contains clues as to who made the anonymous complaint to DFS containing allegations of child abuse and neglect against Smith. The DFS intake report refers to the caller as "she." (*Id.* at A61) The report also reflects that

the caller identified herself as a "professional caregiver who comes into the home." (*Id.*) The caller further indicated that she "last saw [M.K.] on Wednesday." (*Id.*) Given that the complaint call came in on Friday, October 28, 2005, it follows that the caller was a female professional caregiver who had been in the Smith home on multiple occasions, most recently on October 26, 2005. This much is not in dispute.[5]

Plaintiffs contend that there is evidence in the record from which a reasonable factfinder could find, consistent with these clues, that either Nurse Brasberger or Nurse Elliott made the anonymous call to DFS. Both Nurse Brasberger and Nurse Elliott are female professional caregivers who were in the Smith home on multiple occasions. HHS records indicate that Brasberger worked in Smith's home on Wednesday, October 26, 2005 the day the anonymous caller reported that she last saw the children, (D.I. 178 at B2) Also on October 26, 2005, Brasberger discussed the possibility of calling the DFS hotline with HHS supervisor Lisa Tarborelli; he next day she discussed the same possibility with HHS nurse Denise Coyle. · (*Id.* at B3–B4) Moreover, as pointed out by Plaintiffs, there are numerous similarities between statements made by the anonymous caller and statements made by Brasberger in her interviews with both DFS and the police officer, as well as in her deposition and as reflected in HHS' contemporaneous records. (D.I. 172 at 17–18) For example, the caller expressed a desire to remain anonymous out of fear for her own safety and that of her family, just as Brasberger expressed the same concerns in the police interview and her deposition. (D.I. 178 at B9; *id.* at B111 at p. 51) Brasberger's concern for her safety is also reflected in

HHS records. (*Id.* at B4) The caller reported that the electric company had most recently come to the Smith house to shut off the power on October 26, 2005; HHS records show that Brasberger reported that the electric company had been to the house that same day. (*Id.* at B3) Also, the caller referenced a leather studded belt, just as Brasberger did in her statements to police and DFS (*id.* at B9), in her deposition (*id.* at B107 at pp. 35–36), and in HHS records (*id.* at B3).

Brasberger denies that she made the anonymous complaint call to DFS on October 28, 2005. (D.I. 163 at 96) Notwithstanding Brasberger's testimony, there is evidence in the record from which a reasonable factfinder could conclude that Brasberger was the anonymous caller. This is a material dispute of fact.

Elliott likewise denies having been the anonymous caller. (D.I. 178 at B82 at p. 45; *id.* at B83 at p. 46) Nonetheless, there is evidence in the record from which a reasonable factfinder could conclude that Elliott did make the call to DFS. Largely this evidence consists of providing a potential motivation for Elliott to have called: concern for the well-being of the children combined with a deteriorating relationship with Smith and a resulting fear that her contact with the children would be terminated. The record contains evidence from which a reasonable factfinder could find that Elliott repeatedly expressed concern regarding the appropriateness of the caregivers in Smith's home. (*See, e.g., id.* at B5; *id.* at B90 at p. 77.) There is also evidence that Elliott treated Smith offensively and frequently argued with her. (*Id.* at B184–86 at pp. 112–20; *id.* at B232 at pp. 68–69; *id.* at B241 at p. 104) Addi-

---

5. The HHS Defendants assert that the term "caregiver" includes family members. (D.I. 183 at 1–2) But, as noted, the DFS intake report states the caller identified herself as a "professional caregiver." A reasonable factfinder could conclude from this identification that the caller was a nurse rather than an unpaid family member.

tionally, the record contains evidence that Elliott referred to herself as "mommy" to the children. (*Id.* at B185 at p. 177) Finally, Elliott and Brasberger were friends and a reasonable factfinder could conclude that they conspired together against Smith. (*Id.* at B81 at p. 41; *id.* at B118 at p. 80)

### 2. 42 U.S.C. § 1983

Having determined that a reasonable jury could find that Defendant Brasberger or Defendant Elliott made the anonymous call to DFS, I turn to whether any of the HHS Defendants are, nonetheless, entitled to summary judgment on any of Plaintiffs' claims. I first examine Plaintiffs' sole federal claim, Count VII, which alleges that the HHS Defendants violated Plaintiffs' rights under 42 U.S.C. § 1983.

Section 1983 states, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action," To state a cause of action under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution or laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *Cullom v. Boeing, Inc.*, 2007 WL 1732097, at *2 (D.Del. Jun. 24, 2007) (internal quotation marks omitted). An individual acts under color of State law when the individual is "clothed with the authority of state law." *Id.* A private citizen, acting in concert with state officials, may also be liable under § 1983. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Count VII alleges the HHS Defendants violated Plaintiffs' civil rights by interfering with Smith's "right to work, right to raise her children, right to privacy, and right to family association." (D.I. 1 at 13) It is uncontested that these are civil rights. Moreover, a reasonable factfinder could conclude from the record evidence that the HHS Defendants participated in joint action with DFS to deprive Smith of these rights (even if the State Defendants themselves were not acting in bad faith). Specifically, one could find that Brasberger or Elliott or both acted in concert with DFS by providing DFS false, inaccurate, and misleading information during the course of DFS' investigation of the Smith home, information which caused DFS to take action that had the consequence of infringing Plaintiffs' civil rights. Accordingly, I recommend that the HHS Defendants' motion for summary judgment on the § 1983 claim be denied.

### 3. Delaware State Law Claims

### a. Immunity under 16 Del. C. § 908

Plaintiffs' remaining claims all arise under state law. Before turning to each claim individually, I must first consider the HHS Defendants' contention that they are immune from liability under 16 Del. C. § 908. This provision of Delaware law provides, in pertinent part: "Anyone participating in good faith in the making of a report or notifying police officers pursuant to this chapter, . . . shall have immunity from any liability, civil or criminal, that might arise." 16 Del. C. § 908(a). In the absence of evidence of malice or willful misconduct, good faith is presumed. 16 Del. C. § 902(10).

I conclude that the record contains evidence from which a reasonable factfinder could find that Brasberger and Elliott acted in bad faith. The pertinent evidence has already been described above, as it is the same evidence that could, if believed, support a conclusion that Brasberger or Elliott made the anonymous call to DFS.

### b. *False Imprisonment*

■■■■■ Count I of Plaintiffs' complaint alleges false imprisonment against the HHS Defendants. One is liable for false imprisonment if: (1) she acted intending to confine the other or a third person within boundaries fixed by the actor; (2) her act directly or indirectly resulted in confinement of the other; (3) the other is conscious of the confinement or is harmed by it; and (4) the confinement is unlawful. *See Lloyd v. Jefferson*, 53 F.Supp.2d 643 (D.Del.1999); *Shaffer v. Davis*, 1990 WL 81892, at *2 (Del.Super. June 12, 1990).

The HHS Defendants are entitled to summary judgment on the false imprisonment claim because Plaintiffs' cannot prove that the confinement of the children was unlawful. This is because Smith stipulated to a finding of probable cause in the Preliminary Protective Hearing Order from the Family Court (hereinafter the "Order"), (D.I. 163 at 8) The Order states:

> Probable cause exists to believe that the above named children continue to be dependent as defined by Del.Code. Ann. Tit. 10 § 901(8) because: Mother and Father stipulate that at the time [DFS] filed for custody of the children, the Department believed Mother was not providing appropriate supervision of the children. The parents stipulated to a finding of probable cause and the parties agreed . . . to discuss a resolution of this case.

(*Id.*) Plaintiffs' contention that Smith only stipulated that DFS believed it had probable cause is incorrect, as the order expressly states that she "stipulated to a finding of probable cause."

Thus, the HHS Defendants should be granted summary judgment on Count I for false imprisonment.

### c. *Negligence*

■■■■ Plaintiffs bring two claims for negligence against the HHS Defendants. Count II alleges that Brasberger, Elliott, and HHS were negligent for failing to provide accurate information to DFS. It alleges that the nurses owed a duty to provide accurate and truthful information to DFS yet breached that duty when one of them reported false information about Smith through the DFS hotline, and later when Brasberger provided false information to DFS social workers conducting an investigation in Smith's home. I conclude that sufficient evidence exists to permit a reasonable jury to find that Brasberger and Elliott, and therefore HHS, breached their duty to Plaintiffs by providing false and inaccurate information to DFS, which had the consequence of harming Plaintiffs by leading to the removal of the children from Smith's home.

■■■■ Count XIV alleges that HHS was negligent for failing to investigate a report that Elliott struck M.K. The record contains the testimony of Mia Huett, another HHS nurse who sometimes worked in the Smith home, who testified that she observed Elliot strike M.K. on the head prior to November 4, 2005. (D.I. 178 at B228 at pp. 51–53) However, even taking this evidence as true, Plaintiffs' theory—that if HHS had investigated the allegation against Elliot then HHS would have told Smith about it, and then Smith would not have allowed Elliot to return to her house, so Elliot would not have been in a position to participate in the events that led to the removal of the children from the home—is too attenuated. Among other things, given that a reasonable factfinder could find that Brasberger made the anonymous complaint, the necessary causal link between HHS' failure to investigate the allegations against Elliot and the removal of the children from Smith's home is not present.

Thus, I recommend that the HHS Defendants' summary judgment motion be

denied with respect to Count II and granted with respect to Count XIV.

### d. *Defamation*

▉▉▉▉ Count III claims the HHS Defendants defamed Plaintiffs. To prove defamation, Plaintiffs must show that the Defendants: (1) made a defamatory communication; (2) published it to a third party; (3) the third party understood that the communication referred to Plaintiff; (4) the third party understood the defamatory content and nature of the statement; and (5) Plaintiff was injured. *Williams v. Howe*, 2004 WL 2828058, at *4 (Del.Super. May 3, 2004).

The record evidence is sufficient to enable a reasonable jury to conclude that Brasberger and Elliot defamed Smith. As already explained, there is evidence from which one could conclude that Brasberger or Elliot made the anonymous complaint to DFS, which could be found to be a defamatory communication published to a third party. Brasberger also made statements to the DFS social workers and a police officer when they were in Smith's home conducting their investigation. It is clear (and seemingly undisputed) that DFS understood that the anonymous complaint and Brasberger's subsequent statements referred to Smith. The removal of the children from the home, and Smith's placement on the Registry, could be found to be a resulting injury. Thus, I recommend that the summary judgment motion with respect to the defamation claim be denied.

### e. *Malicious Prosecution*

▉▉▉▉ Count IV alleges malicious prosecution against the HHS Defendants. A claim for malicious prosecution requires evidence of: (1) the institution of regular judicial proceedings; (2) without probable cause; (3) with malice; (4) termination of the proceedings in the aggrieved party's favor; and (5) damages. *Read v. Carpenter*, 1995 WL 945544, at *1 (Del.Super. June 8, 1995).

I recommend that summary judgment be granted to the HHS Defendants on the malicious prosecution claim because Plaintiffs cannot establish that the Family Court proceedings were instituted without probable cause or that they terminated in the Plaintiffs' favor. As noted above, the Order on its face states that "[p]robable cause exists to believe that the above named children continue to be dependent." Moreover, the Family Court granted the emergency order sought by DFS to obtain tentative custody of the children.

### f. *Civil Conspiracy*

▉▉▉▉ Count XI asserts a claim of civil conspiracy against the HHS Defendants. To prevail on this claim, Plaintiffs must show: "(1) [a] confederation or combination of two or more persons; (2) [a]n unlawful act done in furtherance of the conspiracy; and (3) [a]ctual damage." *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149–50 (Del.1987). Each person involved is "jointly and severally liable for the acts of co-conspirators committed in furtherance of the conspiracy." *Id.* at 150. Plaintiffs allege that Brasberger and Elliot conspired with one another and with Finn and DFS. For the reasons described above in connection with who may have made the anonymous complaint to DFS about Smith, the evidence in the record is sufficient, if believed, to support a finding that Brasberger and Elliot combined by unlawfully making false statements to DFS which damaged Plaintiffs because they caused the removal of the children from Smith's home. Accordingly, I recommend that summary judgment be denied with respect to Plaintiffs' conspiracy claim.

### g. *Interference with Custody*

▉▉▉ Count X asserts a claim for interference with custody. As Defendants observe, in *Matthaeus v. Matthaeus*, 2003 WL 1826285 (Del.Super. Apr. 7, 2003), the

Delaware Superior Court indicated that Delaware does not recognize this tort, (D.I. 172 at 30) It is true, as Plaintiffs point out, that the judge's statements in *Matthaeus* were dicta, as the court found it lacked jurisdiction. *See* 2003 WL 1826285, at *5. While the Restatement (Second) of Torts § 700 recognizes the interference with custody tort, and has been adopted by numerous other jurisdictions, I predict, based on *Matthaeus,* that the Delaware Supreme Court would not recognize this tort.[6] Accordingly, I recommend that the HHS Defendants' summary judgment motion be granted with respect to Plaintiffs' interference with custody claim.

### h. *Punitive Damages*

 Finally, the HHS Defendants seek summary judgment that Plaintiffs may not obtain punitive damages. (D.I. 162 at 27) Under Delaware law, punitive damages are available "as punishment to the tortfeasor when his wrongful act was committed willfully or wantonly." *Bryan v. Thos. Best & Sons, Inc.*, 453 A.2d 107, 108 (Del.Super.1982). Delaware courts award punitive damages "only if there is an element of ill will, malice or intention to cause injury to [a] plaintiff." *Id.* at 108–09. As already discussed, the record contains sufficient evidence to permit a reasonable factfinder to find that Brasberger and Elliot acted willfully to injure Plaintiffs. Therefore, I recommend that the HHS Defendants' motion for summary judgment with respect to Plaintiffs' request for punitive damages be denied.

### C. *Motion to Exclude Evidence*

The HHS Defendants have filed a Motion to Exclude Plaintiffs' Expert and Plaintiffs' Expert Reports under *Daubert* and Federal Rule of Evidence 702. (D.I.

158) By this motion, the HHS Defendants seek to preclude Plaintiffs' expert, Dr. Siobhan Irwin, from providing testimony regarding, among other things, emotional trauma allegedly suffered by the minor Plaintiffs, the procedures DFS should have followed in making a determination of medical neglect, and the information Dr. Irwin would have provided DFS had DFS contacted her. I will deny the motion in part and grant it in part.

Dr. Irwin is a pediatrician and has treated the minor Plaintiffs since their birth in 2000. (D.I. 186 at 4–5) She prepared an amended medical report setting forth her opinions as to the "lasting emotional trauma" the minor Plaintiffs suffered as a result of being removed from their mother's custody. (D.I. 161 Ex. B) In her report, Dr. Irwin also opined that, in circumstances such as those presented here, a physician should be consulted before a determination of medical neglect is reached, (*Id.*) Dr. Irwin also writes that, had DFS contacted her before removing the minor Plaintiffs from their home, she would have provided DFS the children's medical history, described Smith's level of care and concern for the children, and advised DFS that separating the children from their mother would be harmful to their health and welfare. (*Id.*)

The HHS Defendants complain that Dr. Irwin does not have the background in psychology necessary to qualify her to opine as to any emotional trauma suffered by the minor Plaintiffs. (D.I. 160 at 6) They also assert that Dr. Irwin's report is inadequate under Federal Rule of Evidence 702 because it is not based on any discernable methodology and relies largely on observations reported to her by Plaintiff Smith. (*Id.* at 7–9) Last, HHS con-

---

**6.** In the absence of a decision on this point by the Delaware Supreme Court, the role of the District Court is to "predict how the state court would resolve the issue if it should be called upon to do so." *Robertson v. Allied Signal, Inc.* 914 F.2d 360, 378 (3d Cir.1990).

tends that Dr. Irwin's report was prepared by Plaintiffs' counsel and not by her, in violation of Federal Rule of Civil Procedure 26(a)(2)(B), which requires that expert disclosures "be accompanied by a written report prepared and signed by the witness." (*Id.* at 9–11)

In response, Plaintiffs insist that Dr. Irwin is qualified to opine on the mental health of the minor Plaintiffs because she is a licensed pediatrician who regularly treats children with various psychological disorders, including the minor Plaintiffs. (D.I. 186 at 4–5) Plaintiffs also contend that Dr. Irwin's opinions are based on reliable information obtained from Smith, as well as her own examination of two of the three children the weekend they were removed from their home. (*Id.* at 6) Plaintiffs further argue that the Federal Rules of Civil Procedure do not require an expert personally to draft her entire report, only that the report accurately reflect the testimony to be given by the expert and be signed by her. (*Id.* at 8–9)

After reviewing the expert report and the parties' contentions regarding it, I find that Dr. Irwin is qualified to opine as to the minor Plaintiffs' emotional state and damage they may have suffered during the three days they were removed from their home. Her opinions are based on her experience as a licensed pediatrician, her observations and treatment of the minor Plaintiffs, and her conversations with Smith, all of which are the types of inputs a pediatrician regularly relies upon. Dr. Irwin is not, however, qualified to opine as to the procedures DFS should have followed. I also find that Dr. Irwin's testimony regarding what she would have told DFS if DFS had contacted her before seeking custody of the children is not relevant and would not be helpful to the jury. Finally, I agree with Plaintiffs that it was not improper for counsel to have assisted Dr. Irwin in drafting her expert report, as

there is no reason to believe the report does not accurately reflect Dr. Irwin's opinions.

Accordingly, the HHS' Defendants' motion to exclude is granted in part and denied in part.

## *RECOMMENDED DISPOSITION AND ORDER*

For the reasons set forth above, I recommend that:

1. The State Defendants' Motion for Summary Judgment be GRANTED with respect to all claims (Counts I, V, VI, VII, VIII, IX, X, XI, and XII) against them.

2. The HHS Defendants' Motion for Summary Judgment be GRANTED with respect to Counts I, IV, X, and XIV, and DENIED with respect to Counts II, III, VII, and XI and on the issue of punitive damages.

Further, IT IS HEREBY ORDERED THAT the HHS Defendants' Motion to Exclude is GRANTED IN PART AND DENIED IN PART. Dr. Irwin may testify as to the emotional harm suffered by the minor Plaintiffs during the three days of their removal from their home.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed.R.Civ.P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections **of no longer than ten (10) pages within fourteen (14) days after being served with a copy of this Report and Recommendation.** Fed. R.Civ.P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson,* 812 F.2d 874, 878–79 (3d Cir.1987); *Sincavage v. Barnhart,* 171 Fed.Appx. 924, 925 n. 1 (3d Cir.2006). **A party responding to objections may do so within fourteen (14) days after being served with a**

copy of objections; such response shall not exceed ten (10) pages. No further briefing shall be permitted with respect to objections without leave of the Court.

The parties are directed to the Court's Standing Order In Non-*Pro Se* Matters For Objections Filed Under Fed.R.Civ.P. 72(b), dated November 16, 2009, a copy of which is available on the Court's website, www.ded.uscourts.gov/StandingOrders Main.htm.

May 17. 2010.

Wilmington, Delaware